UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JASON KING,

    Petitioner,

v.

PAT L. VAZQUEZ,

    Respondent.

Case No. 15-cv-03260-EMC

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

## I. INTRODUCTION

Jason King filed this action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 to challenge his state court conviction for first degree murder and other crimes. Respondent has filed an answer. Mr. King has not filed a traverse, although the deadline by which to do so has long passed. For the reasons discussed below, the Court denies the petition.

## II. BACKGROUND

The California Court of Appeal described the evidence at trial:

> Sherman "June" Hart testified that he knew defendant and Evan Williams from around the neighborhood. Defendant and Williams were always together.
>
> On June 10, 2007, Hart ran into defendant and Williams at Alice's house on 72nd Street in Oakland. Williams took Hart's two dollars that were on a dresser and started to leave. Hart followed them out the door and said, "Hold on man. What you doing?" Williams turned around and knocked Hart into the bush.
>
> Approximately 20 minutes later, Hart saw Jason McGill at the corner of 71st and Hamilton. McGill was selling drugs and had sacks of marijuana in his hand and rock cocaine in his mouth. Hart was on his bicycle and spoke to McGill for about 15 to 20 minutes. At some point, he noticed a blue four-door Buick traveling south from International coming down 71st Street. He then saw Williams

and defendant approach. Williams asked Hart, "June, nigga, what you got your bitch ass nigga ass here for?"

Williams and defendant were leaning against a wall about three feet away from Hart and McGill. Hart saw Williams hand a black pistol to defendant. Defendant stepped behind McGill and fired the gun at his head. Hart then fled on his bicycle. As he was cycling toward 69th Street, a number of gunshots were directed at him that ricocheted off the bicycle. He heard about five gunshots. He looked back and saw that defendant was shooting the gun. Hart did not immediately notice that he had been hit in the lower calf area of his leg. He proceeded to try to get out of the area. When he reached International Boulevard, he realized that he had been hit in the leg. A friend saw him and flagged down a police car. Hart was taken by ambulance to the hospital where he was treated. In addition to the gunshot wound to his leg, a bullet had also grazed his buttock. McGill died from the gunshot wound to his head.

Sergeant Andreotti investigated the shooting. He took a statement from Hart at the hospital at about 3:00 a.m. on June 11, 2007. Hart provided a description of the suspects in the shooting. Andreotti's investigation led to the identification of defendant and Williams as suspects. Two days after the shooting, Hart identified defendant and Williams in a photographic lineup.

The police recovered a gun when they arrested Jerrin Carpenter in Oakland on June 11, 2007 for possession of a firearm. Carpenter had purchased the weapon earlier that evening in a dice game. The police subsequently determined that it was the murder weapon. [Footnote omitted.] On September 6, 2007, the police arrested defendant and Williams after stopping them in a gray Buick. Williams provided a statement to the police.

After defendant's arrest, he was incarcerated in the Santa Rita jail and housed in the cell next to Raul Villanueva. Villanueva helped defendant with reading and writing and in preparing defendant's prisoner complaints. Villanueva testified that defendant told him that he was in jail because he was charged with murder. Defendant told him that he was involved in a shooting where the victim was shot in the back of the head. The victim was shot because he was selling drugs on "his block" and refused to leave. Defendant told Villanueva that his brother had been killed on that block and that he had no problems with taking people out on that block.

Defendant offered Villanueva a car and $7,000 to take care of a witness in his case. Villanueva did not follow through with defendant's plan; he was interested only in purchasing the car.

Villanueva testified that his life was ruined as a result of having to testify in this case. He had received threats and, two days prior to his testimony, some people tried to throw him in a van and told him to "[k]eep your mouth shut."

Williams testified at the preliminary examination. He refused to testify at trial; his preliminary hearing testimony was read to the jury. [Footnote omitted.] The court found that Williams was

> unavailable as a witness under Evidence Code section 240, subdivision (6) and permitted the People to introduce his testimony from the preliminary examination.
>
> Williams testified that he had known defendant for probably 14 years. On the evening of June 10, 2007, he was with defendant and they were selling cocaine and marijuana in the neighborhood of 71st Street in Oakland. He said that he had gotten into a squabble with Hart earlier at Alice's house. He later went to the liquor store with defendant and walked back toward 71st and Hamilton where he saw Hart and McGill. He thought that McGill was selling Hart drugs. He approached Hart and started to swear at him. He then heard a gunshot behind him and subsequently he heard multiple gunshots. He saw a gun in defendant's hand, and saw that McGill was on the ground. Williams fled up 71st Street. He saw defendant fire at Hart who was riding away on his bicycle. Defendant fired five to seven shots at Hart. Williams and defendant believed that McGill was involved in the killing of Rudy Junior, their friend, who was killed at almost the same spot as McGill.
>
> The parties stipulated that defendant suffered several previous arrests for drug possession and sales in the vicinity of 71st and Hamilton. The parties further stipulated that defendant was convicted of misdemeanor possession of marijuana, sale of cocaine base and possession for sale of marijuana and that he had admitted two probation violations. The parties also stipulated that Villanueva had suffered numerous felony convictions.

*People v. King*, California Court of Appeal No. A134044, opinion filed March 27, 2014 ("Cal. Ct. App. Opinion") at 1-4.

Following the jury trial in Alameda County Superior Court, Mr. King was convicted of first degree murder and attempted murder. The jury also found true the allegations that Mr. King had used a firearm and intentionally discharged it in the commission of the crimes. Mr. King was sentenced on December 9, 2011 to a total of eighty-two years to life in prison.

Mr. King appealed. The California Court of Appeal affirmed his conviction in March 2014, and the California Supreme Court denied his petition for review in June 2014. Mr. King also filed petitions for writ of habeas corpus in the California Court of Appeal and California Supreme Court, which were summarily denied.

Mr. King filed this action for a writ of habeas corpus in July 2015, and requested a stay so that he could return to state court to present some claims to that court. Eventually, the stay was lifted and Mr. King filed a second amended petition that asserted four claims for federal habeas relief. Three of the claims were dismissed for failure to exhaust state court remedies. (Docket No.

25.) The sole claim remaining for adjudication in this federal action for writ of habeas corpus is a due process claim. Specifically, Mr. King asserts that his right to due process was violated by the admission of evidence of an attack on Mr. Villanueva, one of the witnesses against him. Respondent has filed an answer. Mr. King has not filed a traverse or otherwise communicated with the court since the traverse deadline of June 30, 2017. The matter is now ready for decision.

### III. JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this action for a writ of habeas corpus under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the petition concerns the conviction and sentence of a person convicted in Alameda County, California, which is within this judicial district. 28 U.S.C. §§ 84, 2241(d).

### IV. STANDARD OF REVIEW

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The Antiterrorism And Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254 to impose new restrictions on federal habeas review. A petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

4

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. "A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was 'objectively unreasonable.'" *Id.* at 409.

The state-court decision to which § 2254(d) applies is the "last reasoned decision" of the state court. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Barker v. Fleming*, 423 F.3d 1085, 1091-92 (9th Cir. 2005). "When there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst*, 501 U.S. at 803. The presumption that a later summary denial rests on the same reasoning as the earlier reasoned decision is a rebuttable presumption and can be overcome by strong evidence. *Kernan v. Hinojosa*, 136 S. Ct. 1603, 1605-06 (2016). Although *Ylst* was a procedural default case, the "look through" rule announced there has been extended beyond the context of procedural default and applies to decisions on the merits. *Barker*, 423 F.3d at 1092 n.3. In other words, when the last reasoned decision is a decision on the merits, the habeas court can look through later summary denials to apply § 2254(d) to the last reasoned decision.

Section 2254(d) generally applies to unexplained as well as reasoned decisions. "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011). When the state court has denied a federal constitutional claim on the merits without explanation, the federal habeas court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the U.S. Supreme] Court." *Id.* at 102.

///

///

///

## V. DISCUSSION

### A. Due Process Claim Based On Evidence Of Attack On Witness

#### 1. Background

Before Raul Villanueva testified, the court considered (outside the presence of the jury) information that he recently had been threatened. The trial court ruled the evidence as admissible because it was "relevant on the subject of the jury's assessment of the witness's credibility and the jury's assessment of the witness's state of mind at the time he testifies." RT 475. The trial court planned to give a limiting instruction when the testimony was given. RT 476.

When the prosecutor reached the point in his questioning where he turned to the subject of recent events connected to Mr. Villanueva's testimony, the court gave this limiting instruction:

> [W]hatever testimony Mr. Villanueva is going to offer with respect to threats that he has received, is admitted only for a limited purpose. The limited purpose is not for the truth of whatever statements are made to Mr. Villanueva, it is offered solely for whatever value it has, if any, for your ability to assess the credibility of this witness and for your ability to assess the witness's state of mind. [¶] So those two things, his credibility as a witness and his state of mind as he testifies today on the witness stand. That's the limited purpose for which Mr. Villanueva may testify regarding threats. [¶] Now, later on in this case, I will remind you of certain evidence that was admitted for a limited purpose. This is one example. There may being (sic) others during the course of the trial.

RT 513.

Mr. Villanueva then testified that he recently was attacked and threatened. Specifically, he testified that several unidentified people "tried to throw me in a van. If I had been thrown in a van, I wouldn't be talking to you right now." RT 514. The assailants said, "'keep your mouth shut.'" Mr. Villanueva thought the attack was related to his upcoming testimony in this case because "[w]hat else would it be? I ain't got nothing with nobody." *Id.* This occurred two days before he testified at trial. *Id.* Mr. Villanueva testified that nothing else had occurred because "I cannot be found and I will not be found." *Id.* On cross-examination, Mr. Villanueva testified that the assailants did not identify themselves and he did not recognize them, but he believed they were Nortenos (although he denied any knowledge about Nortenos). RT 531-32.

Mr. King contended on appeal that his state law rights and his right to due process were

violated by the admission of the attack evidence. He argued that, although there was no evidence that he or his family had anything to do with the attack, the jury likely would have attributed the attack to him. *See* Docket No. 14 at 20-21.

The California Court of Appeal rejected the challenge to the admission of this evidence. The state appellate court discussed why the evidence was properly admitted under state law:

> "Evidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible. [Citations.] An explanation of the basis for the witness's fear is likewise relevant to [his] credibility and is well within the discretion of the trial court. [Citations.]" (*People v. Burgener* (2003) 29 Cal.4th 833, 869.) Evidence of a third party threat may also bear on the credibility of a witness even if the threat is not directly linked to the defendant. (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1084.) . . .
>
> The court did not abuse its discretion in admitting the evidence. The evidence that Villanueva was attacked just days before his testimony was relevant to his state of mind and to his credibility. (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1368.) "A witness who testifies despite fear of recrimation of any kind by anyone is more credible because of his or her personal stake in the testimony." (*Ibid*.) It is immaterial whether the source of the threat came from the defendant; the important fact is that the witness is testifying despite fear of recrimation. (*Id*. at p. 1369.) The jury is entitled to evaluate the witness's testimony with the knowledge that it was given under fear of retaliation. (*Ibid*.) . . .
>
> Here, Villanueva's testimony was not cumulative of evidence showing that he was fearful of testifying. While the testimony of Sergeant Gus Galindo also showed that Villanueva was a reluctant witness in that he feared being labeled a snitch,[5] that evidence was not cumulative of the fact that he was threatened immediately prior to his testimony. The threat evidence was highly relevant to show Villanueva's state of mind and credibility.
>
> > [footnote 5]: Galindo testified that during the interview, Villanueva expressed concern that he could be labeled as an informant or snitch which could get him injured or killed.
>
> Moreover, any potential for prejudice from the evidence was eliminated by the court's limiting instruction. (*People v. Mendoza, supra*, 52 Cal.4th at p. 1088.) During Villanueva's testimony, the court instructed the jury that his testimony about threats was being received for the limited purpose of assessing "the credibility of this witness and for your ability to assess the witness's state of mind."

Cal. Ct. App. Opinion at 4-6.

Although the state appellate court opinion did not discuss the federal constitutional claim

that had been presented to it with the state law claim, the decision is presumed to be a rejection of the federal constitutional claim on the merits. *See Harrington*, 562 U.S. at 99. Thus, this court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the U.S. Supreme] Court." *Id.* at 102.

2. <u>Analysis</u>

The United States Supreme Court has never held that the introduction of propensity or other allegedly prejudicial evidence violates due process. *See Estelle v. McGuire*, 502 U.S. 62, 68-70 (1991); *id.* at 75 n.5 ("we express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime").

In *Estelle v. McGuire*, the defendant was on trial for murder of his infant daughter after she was brought to a hospital and died from numerous injuries suggestive of recent child abuse. Defendant told police the injuries were accidental. Evidence was admitted at trial that the coroner discovered during the autopsy older partially healed injuries that had occurred six to seven weeks before the child's death. *Id.* at 65. Evidence of the older injuries was introduced to prove "battered child syndrome," which "exists when a child has sustained repeated and/or serious injuries by nonaccidental means." *Id.* at 66. The state appellate court had held that the proof of prior injuries tending to establish battered child syndrome was proper under California law. *Id.* In federal habeas proceedings, the Ninth Circuit found a due process violation based in part on its determination that the evidence was improperly admitted under state law. *Id.* at 66-67. The U.S. Supreme Court first held that the Ninth Circuit had erred in inquiring whether the evidence was properly admitted under state law because "'federal habeas corpus relief does not lie for errors of state law.'" *Id.* at 67. The Supreme Court then explained:

> The evidence of battered child syndrome was relevant to show intent, and nothing in the Due Process Clause of the Fourteenth Amendment requires the State to refrain from introducing relevant evidence simply because the defense chooses not to contest the point. [¶] Concluding, as we do, that the prior injury evidence was

8

> relevant to an issue in the case, we need not explore further the apparent assumption of the Court of Appeals that it is a violation of the due process guaranteed by the Fourteenth Amendment for evidence that is not relevant to be received in a criminal trial. We hold that McGuire's due process rights were not violated by the admission of the evidence. *See Spencer v. Texas*, 385 U.S. 554, 563–564, 87 S.Ct. 648, 653–654, 17 L.Ed.2d 606 (1967) ("Cases in this Court have long proceeded on the premise that the Due Process Clause guarantees the fundamental elements of fairness in a criminal trial . . . . But it has never been thought that such cases establish this Court as a rulemaking organ for the promulgation of state rules of criminal procedure").

*Estelle v. McGuire*, 502 U.S. at 70 (omission in original).

The cited case, *Spencer v. Texas*, 385 U.S. at 563, held that the admission of evidence of prior convictions did not violate due process. The Supreme Court explained in *Spencer* that, although there may have been other, perhaps better, ways to adjudicate the existence of prior convictions (e.g., a separate trial on the priors after the trial on the current substantive offense resulted in a guilty verdict), Texas' use of prior crimes evidence in a "one-stage recidivist trial" did not violate due process. *Id.* at 563-64. "In the face of the legitimate state purpose and the long-standing and widespread use that attend the procedure under attack here, we find it impossible to say that because of the possibility of some collateral prejudice the Texas procedure is rendered unconstitutional under the Due Process Clause as it has been interpreted and applied in our past cases." *Id.* at 564.

*Estelle v. McGuire* also cited to *Lisenba v. California*, 314 U.S. 219, 228 (1941), in support of the conclusion that the introduction of the battered child syndrome evidence did not so infuse the trial with unfairness as to deny due process of law. *See Estelle v. McGuire*, 502 U.S. at 75. In *Lisenba*, the Supreme Court rejected a claim that the admission of inflammatory evidence violated the defendant's due process rights. The evidence at issue in *Lisenba* was live rattlesnakes and testimony about them to show they had been used by the defendant to murder his wife. "We do not sit to review state court action on questions of the propriety of the trial judge's action in the admission of evidence. We cannot hold, as petitioner urges, that the introduction and identification of the snakes so infused the trial with unfairness as to deny due process of law. The fact that evidence admitted as relevant by a court is shocking to the sensibilities of those in the courtroom cannot, for that reason alone, render its reception a violation of due process." *Lisenba*, 314 U.S. at

9

228-29.

These three Supreme Court cases declined to hold that the admission of prejudicial or propensity evidence violates the defendant's due process rights. No Supreme Court cases since *Estelle v. McGuire* have undermined the holdings in these three cases. In other words, there is no Supreme Court holding that the admission of prejudicial or propensity evidence violates due process.

The Supreme Court has, however, established a general principle of "fundamental fairness," i.e., evidence that "is so extremely unfair that its admission violates 'fundamental conceptions of justice'" may violate due process. *Dowling v. United States*, 493 U.S. 342, 352 (1990) (quoting *United States v. Lovasco*, 431 U.S. 783, 790 (1977) (due process was not violated by admission of evidence to identify perpetrator and link him to another perpetrator even though the evidence also was related to crime of which defendant had been acquitted)). Thus, the court may consider whether the evidence was "so extremely unfair that its admission violates 'fundamental conceptions of justice.'" *Id.*

In this circuit, the admission of prejudicial evidence may make a trial fundamentally unfair and violate due process "[o]nly if there are no permissible inferences the jury may draw from the evidence." *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991). "Evidence introduced by the prosecution will often raise more than one inference, some permissible, some not; we must rely on the jury to sort them out in light of the court's instructions. Only if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must 'be of such quality as necessarily prevents a fair trial.' Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose." *Jammal*, 926 F.2d at 920 (internal citation and footnote omitted).[1]

---

[1] In *Jammal*, the police found a gun, $47,000 and drugs in the trunk of Jammal's stolen car when they arrested Willis, who had stolen Jammal's car; 18 months later, the police found $135,000 (but no drugs) in the trunk of Jammal's car when they arrested Jammal. At trial, Willis said he had no idea the drugs and money were in the trunk of Jammal's stolen car until police opened it. The prosecution urged the jury to infer that both the drugs and the $47,000 found in the trunk of Jammal's car when Willis was arrested belonged to Jammal since Jammal later was arrested also with a large stash of cash in his trunk. Jammal unsuccessfully objected that this evidence effectively branded him a drug dealer and was therefore inadmissible character evidence. The

10

Here, the California Court of Appeal reasonably could have determined that the admission of evidence of the attack and threat did not meet the very demanding standard of being so extremely unfair that its admission violates fundamental conceptions of justice. There were permissible inferences about the credibility of Mr. Villanueva that could be drawn from the evidence.

When Mr. Villanueva testified, he was hostile to his questioners and plainly did not want to testify. He apparently turned and faced away from the defendant during his testimony and looked at a wall instead. *See* RT 507 (court admonishes Mr. Villanueva to "turn around so you're talking more into that microphone"); RT 1307 (prosecutor notes in closing argument that Mr. Villanueva "would not even look in this direction. He looked toward the wall to your left. This is not somebody who appreciated my questions. Not somebody that appreciated [defense counsel's] questions.") Mr. Villanueva repeatedly expressed his displeasure at having to testify. *See* RT 494 (court directs Mr. Villanueva to answer the question after Mr. Villanueva was asked whether Mr. King told him how Mr. King was involved with the shooting and Mr. Villanueva responded, "Um, why are you asking me these questions when you can play it on tape? I don't understand that."); RT 511 (when asked if there had "been any consequences to you as a result of being asked to testify," Mr. Villanueva answered: "Look at my head, okay? I don't know what the hell is going on. But the basic line is, is that you guys had me come here. You already had it all on tape. You had all these phone conversations. You ruined my life now because of this.") And Mr.

---

Ninth Circuit explained that state law evidence rules were beside the point in a federal habeas proceeding and any problem in the jury inferring that Jammal had put the $47,000 and drugs in the car earlier (even if impermissible under state law) was not a constitutional problem because the inference that Jammal had put both the $47,000 and drugs in the trunk on an earlier occasion was a "rational inference" the jury could draw from the evidence that he was caught with $135,000 in his trunk. *Jammal*, 926 F.2d at 920.

*Jammal* is one of the few cases that gives any guidance as to what might amount to the introduction of evidence that might amount to fundamental unfairness. The Ninth Circuit continues to use the *Jammal* "permissible inference" test in habeas cases governed by the AEDPA. *See, e.g., Noel v. Lewis*, 605 F. App'x 606, 608 (9th Cir. 2015) (admission of gang evidence did not violate due process); *Lundin v. Kernan*, 583 F. App'x 686, 687 (9th Cir. 2014) (citing *Jammal* and concluding that admission of graffiti evidence did not violate due process because there were permissible inferences to be drawn); *Gonzalez v. Knowles*, 515 F.3d 1006, 1011 (9th Cir. 2008) (citing *Jammal* and concluding that evidence of prior bad acts did not violate due process).

11

Villanueva repeatedly gave terse denials but gave fuller and conflicting answers only after confronted with his earlier recorded statements.[2]

The evidence was relevant because it aided the jury in assessing Mr. Villanueva's credibility, as the California Court of Appeal explained in discussing the state law claims. (Indeed, Mr. King conceded on appeal that the evidence was relevant for this purpose, and argued that it was unduly prejudicial. *See* Docket No. 28-4 at 16.) The transcript shows that Mr. Villanueva was a reluctant witness, especially as to any matters that incriminated Mr. King. Evidence that he had recently been threatened bolstered Mr. Villanueva's credibility with respect to his earlier statements that he reluctantly confirmed at trial. By learning that Mr. Villanueva recently had been threatened, the jury might be more understanding of his hostile body language and give greater weight to those statements made before unidentified hoodlums attacked him just days before trial and told him to keep his mouth shut.

From the evidence that Mr. Villanueva had recently been attacked and threatened, the jury could draw the inference that his looking away from the defendant and his generally hostile attitude were not because he was lying on the witness stand but were instead because he feared retaliation if he testified. The evidence would let the jury learn that the witness was afraid, and learn the facts that would enable them to evaluate the source of that fear and its effect on the

---

[2] For example, when he was first asked what Mr. King told him about Mr. King's involvement in the shooting, Mr. Villanueva responded: "Stuff happens. Somebody got popped. That's basically all he told me. And that he was trying to fight an all day case." RT 495. Later, as the prosecutor readied to play the tape of the earlier statement Mr. Villanueva had made to police, Mr. Villanueva answered that Mr. King had told him that the shooting was because of "[b]ad business. Somebody was on the block wasn't supposed to be there, obviously." RT 497. Later still, after further reading of his earlier transcribed interview with police, Mr. Villanueva testified that Mr. King had said that the shooting occurred because the victim was dealing drugs on Mr. King's drug-dealing corner or block and did not leave after being told to leave a few days earlier. RT 498-99, 502-04.

Mr. Villanueva's reluctance to implicate Mr. King at trial also was shown in other testimony. When asked whether Mr. King had said he was a member of a group called the Bammer Boys, Mr. Villanueva responded, "Hmm. You obviously got that on tape too. Yes." RT 498. After denying that he had told the officer that there was someone in particular in Mr. King's family that people should be aware of, the prosecutor read a transcript in which Mr. Villanueva mentioned a person named "Stutters." Mr. Villanueva responded, "I'm sure if you got it on tape, yeah, I'm sure that's what he said." RT 506. *See also* RT 505 (after portion of interview transcript read to him, Mr. Villanueva responded, "All right. Well, then I must have said that. Like I said, that was four years ago."); RT 506.

12

witness. *Cf. United States v. Abel,* 469 U.S. 45, 52 (1984) ("Bias may be induced by a witness' like, dislike, or fear of a party, or by the witness' self-interest. Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony."); *e.g., id.* (defendant's and witness' membership in a prison gang supported the inference that witness' testimony "was slanted or perhaps fabricated in respondent's favor");; *Jones v. McGrath*, 276 F. App'x 593, 593 (9th Cir. 2008) ("[Petitioner] contends that the trial court violated his due process rights by admitting evidence that a prosecution witness feared that [Petitioner] would have him killed if he testified. . . . Because testimony about the witness' fear of [Petitioner] is relevant under *Abel*, we cannot agree with [Petitioner's] contention that the state court decision was 'contrary to, or involved an unreasonable application of' Supreme Court precedent."). One court has observed that "threat evidence has extremely limited probative value towards credibility, unless the evidence bears directly on a specific credibility issue regarding the threatened witness. For example, . . . to explain a witness' inconsistent statements, delays in testifying, or even courtroom demeanor indicating intimidation." *United States v. Thomas*, 86 F.3d 647, 654 (7th Cir. 1996) (threat evidence introduced to bolster witnesses' overall credibility to show that they testified against defendants in the face of threats was error under Federal Rule of Evidence 403 because there was no finding or record showing that the witness appeared intimidated; error was harmless, however). Here, the evidence that Mr. Villanueva was attacked and threatened just days before testifying helped explain his inconsistent statements and unusual courtroom demeanor. *See id.; see also United States v. DeLillo*, 620 F.2d 939, 947 (2d Cir. 1980) (no error under Federal Rule of Evidence 403 in admitting evidence that defendant's father threatened government witness; the evidence "may have enabled the jury to resolve conflicts in credibility with respect to other issues on which [the witness] testified").

There was other evidence that Mr. Villanueva was concerned about the danger of testifying, but the evidence of the recent attack and threat was not cumulative of that evidence. The jury had heard evidence that, when interviewed by police officers while in prison in February 2008, Mr. Villanueva repeatedly said he could be labeled a snitch, and that could get him injured

13

or killed. RT 746. But that concern was expressed by Mr. Villanueva three-and-a-half years before trial, and did not have the same impact as the more specific threat made just two days before he testified at trial.

The attack and threat were not at all central to the trial. The attack and threat were alluded to only once in the prosecutor's closing argument, and not at all in the prosecutor's rebuttal argument.[3] The prosecutor made no effort to connect the attack to Mr. King. Defense counsel urged in his closing argument that Mr. Villanueva was afraid of lots of people and had many enemies. RT 1353-54. Defense counsel's argument was based on evidence that Mr. Villanueva earlier had been in the Nortenos gang and believed that the gang had put a $10,000 bounty on him. *See* RT 743-45, 755.

Further, the jury was given a limiting instruction immediately before Mr. Villanueva testified about the attack and threat. The court instructed the jury that the evidence was "not for the truth of whatever statements are made to Mr. Villanueva," and instead only for the jury's use to "assess the credibility of this witness and for your ability to assess the witness's state of mind." RT 513. At the close of trial, the jury instructions included a general instruction on witness credibility, RT 1387-89, as well as a specific instruction that Mr. "Villanueva is an in-custody informant" and that the "testimony of an in-custody informant should be viewed with caution and close scrutiny." RT 1398. The jury is presumed to have followed these instructions. *See Francis v. Franklin*, 471 U.S. 307, 324 n.9 (1985) ("The Court presumes that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them").

The California Court of Appeal reasonably could have concluded there was no due process violation using the same reasoning it used to reject the state law claims: the attack and threat evidence was relevant in that the jury could use it to assess the witness' credibility and state of

---

[3] The prosecutor's one reference to the attack and threat was in the context of discussing Mr. Villanueva's testimony. The prosecutor argued that Mr. Villanueva first had to be impeached with his prior statement, but ultimately told the jury what Mr. King had told him (Mr. Villanueva). The prosecutor then continued, "I don't think anybody expects Mr. Villanueva to be in a situation that he was in. He told you he was scared for his life, to just come out and say freely what exactly was told to him on that night." RT 1307.

14

mind at the time he testified. The jury could draw the inference that Mr. Villanueva was being truthful in his (albeit grudging) testimony that Mr. King had admitted doing the shooting and had asked him to kill the witness, Evan Williams. Because this inference is permissible, the state appellate court did not unreasonably apply Supreme Court authorities in holding that the admission of the evidence did not violate due process. *See Jammal*, 926 F.2d at 920.

"[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). Bearing in mind the extremely general nature of the Supreme Court's articulation of a principle of "fundamental fairness" – i.e., evidence that "is so extremely unfair that its admission violates 'fundamental conceptions of justice'" may violate due process, *see Dowling*, 493 U.S. at 352 – the California Court of Appeal's rejection of Mr. King's due process claim was not contrary to or an unreasonable application of clearly established federal law as set forth by the Supreme Court. *See generally Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (denying writ because, although Supreme Court "has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." (internal citation omitted)).

B. <u>No Certificate of Appealability</u>

A certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c). This is not a case in which "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Accordingly, a certificate of appealability is **DENIED**.

///
///
///
///
///

15

## VI. CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus is **DENIED** on the merits. The Clerk shall close the file.

**IT IS SO ORDERED**.

Dated: September 18, 2017

EDWARD M. CHEN
United States District Judge